# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **CHARLEEN D. WASHINGTON,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | **SA-06-CA-0318 FB (NN)** |
| **Commissioner of the Social** | § | |
| **Security Administration,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

**TO:   Hon. Fred Biery**
**United States District Judge**

## I. Introduction

Plaintiff Charleen Washington seeks review and reversal of the administrative denial of

her application for Supplemental Security Income (SSI) by the defendant, the Commissioner of

the Social Security Administration (SSA).  Washington contends that the Administrative Law

Judge (ALJ) erred by determining that she was capable of doing sedentary work and that the ALJ

failed to consider the impact of her multiple impairments on her ability to work.  Washington

asks the Court reverse the decision denying her benefits and to render judgment in her favor.

After considering Washington's brief in support of her complaint,[1] the brief in support of the

---

[1]Docket entry # 7.

Commissioner's decision,[2] Washington's reply brief,[3] the record of the SSA proceedings, the pleadings on file, the applicable case authority and relevant statutory and regulatory provisions, and the entire record in this matter, I recommend affirming the Commissioner's decision.

I have jurisdiction to enter this Memorandum and Recommendation under 28 U.S.C. § 636(b) and this district's general order, dated July 17, 1981, referring all cases where a plaintiff seeks review of the Commissioner's denial of the plaintiff applications for benefits for disposition by recommendation.[4]

## II. Jurisdiction

The District Court has jurisdiction to review the Commissioner's final decision as provided by 42 U.S.C. §§ 405(g), 1383(c)(3).

## III. Administrative Proceedings

Based on the record in this case, Washington fully exhausted her administrative remedies prior to filing this action in federal court.  Washington applied for SSI benefits on October 3, 2003, alleging disability beginning September 20, 2001.[5]  The Commissioner denied the application initially and on reconsideration.[6]  Washington then asked for a hearing.[7]  A hearing

---

[2]Docket entry # 8.

[3]Docket entry # 9.

[4]*See* Local Rules for the Western District of Texas, appx. C, p. 10.

[5]SSA record, p. 49.

[6]*Id*. at pp. 24, 25 & 32.

[7]*Id*. at p. 36.

was held before the ALJ on July 18, 2005.[8]  The ALJ issued a decision on October 26, 2005,

concluding that Washington was not disabled within the meaning of the Social Security Act (the

Act).[9]  Washington asked for review of the decision on December 28, 2005.[10]  The SSA Appeals

Council concluded on February 3, 2006 that no basis existed for review of the ALJ's decision.[11]

The ALJ's decision became the final decision of the Commissioner for the purpose of the Court's

review pursuant to 42 U.S.C. § 405(g).  On April 11, 2006, Washington filed this action seeking

review of the Commissioner's decision.[12]

## IV.  Issue Presented

Is the ALJ's decision that Washington is not under a "disability,"
as defined by the Act supported by substantial evidence and does
the decision comport with relevant legal standards?

## V.  Analysis

### A. Standard of Review

In reviewing the Commissioner's decision denying disability benefits, the reviewing court

is limited to determining whether substantial evidence supports the decision and whether the

Commissioner applied the proper legal standards in evaluating the evidence.[13]  "Substantial

evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a

---

[8]*Id*. at p. 227-48.

[9]*Id*. at p. 11.

[10]*Id*. at p. 9.

[11]*Id*. at p. 5.

[12]*See* Washignton's complaint, docket entry # 1.

[13]*Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); 42 U.S.C. §§ 405(g), 1383(c)(3).

reasonable mind might accept as adequate to support a conclusion."[14]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[15]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[16]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner.[17]  Conflicts in the evidence and credibility assessments are for the Commissioner and not for the courts to resolve.[18]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[19]

---

[14]*Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[15]*Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (quoting *Hames*, 707 F.2d at 164).

[16]*Martinez*, 64 F.3d at 173.

[17]*Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also Villa*, 895 F.2d at 1021 (The court is not to reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.).

[18]*Martinez*, 64 F.3d at 174.

[19]*Id.*

### 1. Entitlement to Benefits

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is under a disability, is eligible to receive SSI benefits.[20]  The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[21]  A claimant shall be determined to be disabled only if her physical or mental impairment or impairments are so severe that she is unable to not only do her previous work, but cannot, considering her age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if she applied for work.[22]

### 2. Evaluation Process and Burden of Proof

Regulations set forth by the Commissioner prescribe that disability claims are to be evaluated according to a five-step process.[23]  A finding that a claimant is disabled or not disabled at any point in the process is conclusive and terminates the Commissioner's analysis.[24]

The first step involves determining whether the claimant is currently engaged in

---

[20]42 U.S.C. § 1382(a)(1) & (2).

[21]42 U.S.C. § 1382c(a)(3)(A).

[22]42 U.S.C. § 1382c(a)(3)(B).

[23]20 C.F.R. §§ 404.1520 and 416.920.

[24]*Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

substantial gainful activity.[25]  If so, the claimant will be found not disabled regardless of her

medical condition or her age, education, or work experience.[26]  The second step involves

determining whether the claimant's impairment is severe.[27]  If it is not severe, the claimant is

deemed not disabled.[28]  In the third step, the Commissioner compares the severe impairment with

those on a list of specific impairments.[29]  If it meets or equals a listed impairment, the claimant is

deemed disabled without considering her age, education, or work experience.[30]  If the impairment

is not on the list, the Commissioner, in the fourth step, reviews the claimant's residual functional

capacity and the demands of her past work.[31]  If the claimant is still able to do her past work, the

claimant is not disabled.[32]  If the claimant cannot perform her past work, the Commissioner

moves to the fifth and final step of evaluating the claimant's ability, given her residual capacities,

age, education, and work experience, to do other work.[33]  If the claimant cannot do other work,

she will be found disabled.  The claimant bears the burden of proof at the first four steps of the

---

[25]20 C.F.R. §§ 404.1520 and 416.920.

[26]*Id.*

[27]*Id.*

[28]*Id.*

[29]*Id.*

[30]*Id.*

[31]*Id.*

[32]*Id.*

[33]*Id.*

sequential analysis.[34]  Once the claimant has shown that she is unable to perform her previous work, the burden shifts to the Commissioner to show that there is other substantial gainful employment available that the claimant is not only physically able to perform, but also, taking into account her exertional and nonexertional limitations, able to maintain for a significant period of time.[35]  If the Commissioner adequately points to potential alternative employment, the burden shifts back to the claimant to prove that she is unable to perform the alternative work.[36]

## B. Findings and Conclusions of the ALJ

In the instant case, the ALJ reached his decision at step five of the evaluation process.  At step one, the ALJ determined that Washington had not engaged in substantial gainful activity since her alleged onset date.[37]  At step two, the ALJ determined that Washington's bilateral knee problems, her status after three arthroscopic surgeries on the right knee, and her right foot problem are medically determinable impairments.[38]  The ALJ characterized these impairments as severe.[39]  At step three, the ALJ found that Washington's impairments do not meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.[40]  At step four, the ALJ found that Washington cannot return to her previous work as a baby-sitter and that she

---

[34]*Leggett*, 67 F.3d at 564.

[35]*Watson  v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002).

[36]*Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

[37]SSA record, p. 19.

[38]*Id.*

[39]*Id.*

[40]*Id.*

has the residual functional capacity to perform the full range of sedentary work.[41]  Because he determined that Washington can perform the full range of sedentary work, the ALJ concluded in step five that Washington is not disabled as defined in the Act.[42]

## C.  Washington's Allegations of Error

Washington maintains that substantial evidence indicates that she is disabled.  She complains that the ALJ failed to consider the cumulative impact of her multiple physical impairments and that the ALJ applied the wrong legal standard in evaluating her complaints about pain.  Washington maintains that she cannot do sedentary work because her feet swell when she sits.[43]  She insists that all movement—sitting, standing, walking, and lying down—cause her so much pain that she is unable to work.[44]  Washington's testimony about her pain, however, is the only evidence that suggests she cannot perform sedentary work.  As discussed below, all other evidence supports the ALJ's determination that Washington can perform the full range of sedentary work.

Washington contends that she became disabled on September 20, 2001—this is the day when a metal table collapsed onto Washington's right big toe.[45]  The SSA record does not indicate whether Washington sought treatment for her toe at the time of her injury, but the records do indicate that Dr. Leo Edwards referred Washington to an orthopedic surgeon—Dr.

---

[41]*Id.*

[42]*Id.* at p. 20.

[43]*Id.* at p. 241.

[44]*Id.* at p. 242.

[45]*Id.* at p. 218.

8

Hilario Trevino.[46]  On September 25, 2001, Dr. Trevino observed that Washington walked with a

limp, but that otherwise Washington was in good health.[47]  X-rays of Washington's right big toe

showed an undisplaced comminuted fracture of the distal phalanx.  The distal phalanx is "the

bone nearest the tip of the toe."[48]  A comminuted fracture is a "fracture in which the bone, or part

of it, is crushed or splintered into several fragments."[49]  At that time, Washington needed a

fracture walking shoe to walk.  Washington continued to see Dr. Trevino until her big toe

healed.[50]  Dr. Trevino reported on January 8, 2002 that Washington's toe had healed, but that

Washington still complained about pain.[51]

Shortly thereafter, Dr. Edwards referred Washington to Dr. Wayne Lee—an orthopaedic

surgeon—because Washington was complaining about pain in her right knee.[52]  On January 15,

2002, Dr. Lee ordered an MRI (magnetic resonance imaging)[53] to determine the cause of the

---

[46]*Id*. at p. 218.  The record references to Dr. Leo Edwards indicate that he is Washington's primary care manager.  The records obtained from Dr. Edwards provide no detail about Washington's problems with her knees and feet.  *See* SSA record, pp. 165-69.

[47]SSA record, p. 218.

[48]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. D-171 (Matthew Bender 2005).

[49]*Id*. at C-373.

[50]SSA record, pp. 178 (visits on Oct. 19, 2001 & Nov. 13, 2002)

[51]*Id*.

[52]*Id*. at p. 131.

[53]An MRI is a "complex electronic procedure for producing images of internal structures of the body.  It is based on the assessment of the density of hydrogen protons in the cell nuclei of the body." J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. M-15 (Matthew Bender 2005).

pain.[54]  The MRI showed mild effusion in the patella femoral joint with an intact anterior cruciate

ligament,[55] an intact posterior cruciate ligament,[56] and intact collateral ligaments.[57]  An effusion

is an "oozing of fluid from a tissue."[58]  The patella is the "kneecap, a rounded triangular bone

situated in front of the knee."[59]  Thus, fluid was oozing in the joint where the thigh bone connects

to the kneecap;[60] all the ligaments that form the knee were intact.  By January 29, 2002, Dr. Lee

had obtained the final results of the MRI and advised Washington that the MRI was positive for

anterior horn of the lateral meniscus as well as an anterior horn of lateral meniscus tear.[61]  "A

meniscus is a crescent-shaped structure made of fibrocartilage."[62]  The knee has "two menisci,

---

[54]SSA record, p. 131.

[55]The anterior cruciate ligament is the '[l]igament within the knee joint that prevents the tibia from sliding too far forward ahead of the femur and helps lock the knee joint when the lower leg straightens out." ATTORNEYS' TEXTBOOK OF MED.: MANUAL OF TRAUMATIC INJURIES § 30A.200 (Matthew Bender 2003).

[56]The posterior cruciate ligament is the "[l]igament within the knee joint that prevents the tibia from sliding too far behind the femur." ATTORNEYS' TEXTBOOK OF MED.: MANUAL OF TRAUMATIC INJURIES § 30A.200 (Matthew Bender 2003).

[57]"The two collateral ligaments of the knee, found on the medial and lateral sides of the joint, keep the knee from moving too far side-to-side in either direction." ATTORNEYS' TEXTBOOK OF MED.: MANUAL OF TRAUMATIC INJURIES § 30A.02 (Matthew Bender 2003).

[58]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. E-31 (Matthew Bender 2005).

[59]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. P-101 (Matthew Bender 2005).

[60]See ATTORNEYS' TEXTBOOK OF MED.: MANUAL OF TRAUMATIC INJURIES § 30.02 (Matthew Bender 2003) ("The knee joint is formed by three bones: the femur (thigh bone), the tibia (shin bone) and the patella (kneecap).").

[61]SSA record, p. 129.

[62]ATTORNEYS' TEXTBOOK OF MED.: MANUAL OF TRAUMATIC INJURIES § 30.02 (Matthew Bender 2003).

located on the medial and lateral sides of the knee joint. . . . [t]hey separate the ends of the thigh and leg bones and act as 'shock absorbers" to protect the cartilage covering the bone ends."[63] The lateral meniscus, or the outer meniscus, is less tightly attached to the tibia than the inner meniscus "so that it is more mobile and can glide back and forth with movements of the femoral condyle."[64]  "The position of the menisci between the lower end of the femur and the upper end of the tibia makes them subject to injury. . . . The menisci weaken with advancing age and, in older persons, damage can result from a comparatively minor injury or from a build-up of minor stresses over the years, as in joggers or distance runners."[65]  "A meniscus commonly is torn either at its margins where it attaches to bone, or at the anterior or posterior horn. . . . Injuries of the anterior . . . horn may or may not heal. . . ."[66]  Dr. Lee advised Washington that she would need an arthroscopy to repair the lateral meniscus.[67]  An arthroscopy is a "procedure by which special instruments including a fiber optic light source are passed through . . . tiny incisions into various parts of the knee joint in order to directly inspect the soft tissues, cartilage and bone."[68]  The procedure is routinely used to diagnose and treat meniscal injuries.[69]  At that time, Washington

---

[63]*Id*. at § 30A.02.

[64]*Id*.

[65]*Id*. at § 30A.04.

[66]*Id*.

[67]SSA record, p. 126.

[68]ATTORNEYS' TEXTBOOK OF MED.: MANUAL OF TRAUMATIC INJURIES § 30A.03 (Matthew Bender 2003).

[69]*See id*.

did not want to have surgery.[70]

Washington decided to undergo surgery on April 25, 2002.  On that day, Dr. Lee performed an arthroscopy and confirmed that Washington's knee had a lateral meniscus tear.  Dr. Lee performed a partial lateral meniscectomy[71] during which he debrided a posterior horn and a medial meniscus.[72]  A meniscectomy is the "surgical removal of a meniscus or semilunar cartilage from the knee joint."[73]  Debride means "to remove dead tissue and foreign matter from the site of an injury."[74]

Despite the procedure, Washington continued to complain about pain in her right knee.[75] Dr. Lee performed a second arthroscopy on November 5, 2002.[76]  In his report of the procedure, Dr. Lee explained that a subsequent MRI showed a tear of the lateral meniscus of the right knee.[77]  Once the arthroscope was inserted into Washington's knee, Dr. Lee observed that the meniscus, anterior cruciate, and posterior cruciate were intact.  Dr. Lee did not observe any significant degenerative disease.  Dr. Lee observed "a large 3x3 mm of the weight bearing

---

[70]SSA record, p. 129.

[71]*Id*. at p. 126.

[72]*Id*. at p. 128.

[73]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. M-127 (Matthew Bender 2005).

[74]*Id*. at D-__.

[75]SSA record, pp. 136 & 214.

[76]*Id*.

[77]*Id*.

surface of the medial femoral condyle with some fraying of the articular cartilage."[78]  A condyle is a "[r]ounded, articular surface at the end of a bone; the 'knuckle' of any joint."[79]  "The articular cartilage is the "layer of cartilage covering the surface of a bone which enters in the formation of a joint.  It acts as a pad."[80]  Dr. Lee stabilized this condition "by shaving the cartilage and using a very low temp to seal the rim.  An ice pick was then used to do an osteochondral drilling until bleeding bone was obtained.  The patient then had the knee scoped for any debris."[81]

After the second surgery, Washington continued to complain about pain.[82]  On December 3, 2002, Dr. Lee prescribed high doses of an anti-inflammatory drug, Celebrex, and advised Washington that if the pain medication did not help, Washington would probably need a knee replacement.[83]  Washington was not interested in surgical intervention at that time.[84]

Washington continued to complain about pain in her right knee, but she did not return to Dr. Lee.  Instead, Dr. Edwards referred Washington to a different orthopedic surgeon—Dr. Roger J. Lunke.  On January 20, 2003, Dr. Lunke reported to Dr. Edwards that Washington's symptoms

---

[78]*Id*. at p. 137.

[79]ATTORNEYS' TEXTBOOK OF MED.: MANUAL OF TRAUMATIC INJURIES § 30.200 (Matthew Bender 2003).

[80]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. A-543 (Matthew Bender 2005).

[81]SSA record, p. 137.

[82]*Id*. at p. 213.

[83]*Id*.

[84]*Id*.

were indicative of progressive lateral compartment degenerative joint disease.[85]  Dr. Lunke stated

that the next step in his treatment plan would be a third arthroscopy.[86]  Dr. Lunke performed a

third arthroscopy on February 1, 2003.[87]  Dr. Lunke reported that the procedure revealed a

"complex regenerative [reparative] tear, anterior central of the lateral meniscus, posterior horn

tear of the medial meniscus with inner meniscal rim instability, lateral patellar compression

syndrome and associated rather marked chondromalacia patella."[88]  Chondromalacia of the knee

joint is a "[d]egeneration of the articular cartilage . . . of the knee joint in the region of the

underside of the patella (kneecap)."[89]  To correct this condition, Dr. Lunke performed arthoscopic

medial and lateral meniscectomies with tricompartmental synovectomy, patellar shaving, lateral

retinacular release.[90]  Dr. Lunke reported to Dr. Edwards that Washington was "showing signs of

rather significant lateral compartment degenerative changes" that would require close monitoring

in the future and possible future surgical intervention.[91]

On June 27, 2003, Dr. Edwards sent Washington back to Dr. Trevino.  Washington told

Dr. Trevino that she continued to suffer pain in her right knee and was also experiencing pain in

---

[85]*Id*. at p. 191.

[86]*Id*.

[87]*Id*. at p. 154.

[88]*Id*. at p. 190.

[89]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. C-235 (Matthew Bender 2005).

[90]SSA record, pp. 154 & 190.

[91]*Id*. at p. 190.

her right foot.[92]  Dr. Trevino examined Washington's right foot and observed some swelling at

the entire dorsum of the foot.[93]  The dorsum of the foot is the "surface of the foot which is

opposite the sole; the part of the foot which one sees looking down upon it."[94]  Washington

complained of severe pain in dorsum of the foot.[95]  X-rays of Washington's foot failed to reveal

any pathology at the bones or any stress fracture that would explain the persistence of pain,

swelling, and Washington's limping, [96] so Dr. Trevino ordered an MRI.[97]  The MRI showed only

soft tissue swelling—no evidence of infection, fracture or anything else to explain Washington's

complaints about pain.[98]  Dr. Trevino opined that Washington might have some type of

sympathetic dystrophy to her right foot.[99]  Reflex sympathetic dystrophy syndrome "sometimes

follow[s] an injury to an upper or lower limb" and is characterized by "unduly prolonged or

intense pain that persists long after the injury has healed. . . ."[100]  Dr. Trevino recommended a

sympathetic block[101] and an evaluation by pain specialist.[102]  The record does not include an

---

[92]Id. at pp. 177 & 219.

[93]Id.

[94]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. D-199 (Matthew Bender 2005).

[95]SSA record, pp. at 177 & 219.

[96]Id.

[97]Id.

[98]Id. at pp. 176 & 202.

[99]Id.

[100]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. R-68 (Matthew Bender 2005).

[101]A sympathetic nerve block is the "blocking of a nerve of the sympathetic nervous system by injection of an anesthetic agent, as for the relief of phantom limb pain. . . . ."  J.E. SCHMIDT, M.D.,

evaluation by a pain specialist.

A few months after Washington saw Dr. Trevino, she applied for disability benefits. The SSA sent Washington's medical records to Dr. Frederick Cremona for a functional capacity assessment. On November 17, 2003, Dr. Cremona opined that Washington could lift 20 pounds occasionally; lift 10 pounds frequently; stand and/or walk (with normal breaks) 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour work day; and that Washington was unlimited in her ability to push/pull[103]—findings consistent with sedentary work. Dr. Cremona stated that the duration and severity of Washington's pain was not reflected in her medical records. Referring to Dr. Trevino's report that Washington may have sympathetic dystrophy, Dr. Cremona wrote that the diagnosis was "based primarily on longevity of pain" and that a diagnosis of reflex sympathetic dystrophy was not definitively established.[104]

Dr. Edwards then referred Washington to another orthopaedic specialist—Dr. Mark Casillas. Dr. Castillas ordered X-rays and an MRI of Washington's right foot. Dr. Casillas reported to Dr. Edwards that the X-rays of the foot were normal and that the MRI was "consistent with mild subcutaneous [under the skin] dorsal edema [accumulation of fluid in the tissues] and diffused degenerative changes."[105] He stated that he had reviewed these findings with Washington and referred her to a pain management specialist. Dr. Casillas opined that

_____

ATTORNEY DICTIONARY OF MED. S-426.1 (Matthew Bender 2005).

[102]SSA record, pp. 176 & 202.

[103]*Id*. at pp. 179-86.

[104]*Id*. at p. 184.

[105]*Id*. at p. 211.

Washington may have regional complex pain syndrome[106]— otherwise called  reflex sympathetic dystrophy.

A few weeks later—on April 6, 2004—Washington was examined by Dr. Wayne H. Gordon at the request of the Texas Rehabilitation Commission (TRC).  The TRC's Disability Determination Services "adjudicates Social Security disability claims in accordance with the Social Security Act."[107]  Dr. Gordon reported that Washington had no difficulty sitting, handling objects, hearing or speaking, but that she would have difficulty with prolonged standing or walking or lifting objects over 20 pounds.[108]  Dr. Gordon further reported that Washington had a decreased range of motion in both knees, but that she ambulates effectively with a right knee brace.[109]

Two weeks later, Dr. Kevin Samaratunga completed a second functional capacity assessment.[110]  Dr. Samaratunga opined that Washington could lift 20 pounds occasionally; lift 10 pounds frequently; can stand and/or walk (with normal breaks) at least 2 hours in an 8-hour workday; can sit for 6 hours in an 8-hour work day; and that Washington was unlimited in ability to push/pull—findings consistent with the ability to perform sedentary work.  Dr. Samaratunga

---

[106]*Id*. at p. 210.

[107]*See* TEX. SERVICES: SUPP. TO THE 2000 BIENNIAL REP., TEX., COUNCIL FOR DEVELOPMENTAL DISABILITIES ¶ 1.5.1 (May 2000), *available at* www.txddc.state.tx.us, click on resources & then on biennial reports.

[108]SSA record, pp. 193-94.

[109]*Id*.

[110]*Id*. at pp. 197-204.

concluded that Washington's alleged limitations were not fully supported.[111]

Seven months later—on December 2, 2004—Dr. Edwards referred Washington back to Dr. Trevino for complaints of left knee pain.[112]  Washington told Dr. Trevino that she had experienced pain in her left knee for 6 months although she had not had an injury.[113]  She stated that the over-counter pain medicine that she had taken had not helped.[114]  Washington complained that her left knee was swollen and that it popped as she walked.[115]  She also complained about numbness in her left foot.[116]  Dr. Trevino observed that pain limited the range of motion in Washington's left knee.[117]  He did not find any arthritis in the left knee.[118]  He opined that Washington might have a torn meniscus and prescribed an arthritis drug, Bextra, and an MRI.[119]  Dr. Trevino also X-rayed Washington's right knee at her request because she continued to complain about pain despite three arthroscopies.[120]  Dr. Trevino observed arthritic changes over the lateral compartment of the right knee and spurs on the femoral condyle and

---

[111]*Id.* at p. 202.

[112]*Id.* at p. 222-3.

[113]*Id.*

[114]*Id.*

[115]*Id.*

[116]*Id.*

[117]*Id.*

[118]*Id.*

[119]*Id.*

[120]*Id.*

medial tibial plateau indicating that Washington had had arthroscopy on the lateral meniscus.[121]

Dr. Trevino opined that the medial compartment of the right knee looked good.[122]

Washington returned twice after Dr. Trevino obtained the results of the MRI.[123] "The

MRI [was] unremarkable.  It [did] not show any tear in the meniscus."[124]  "The lab work [was]

also negative."[125]  Dr. Trevino treated Washington's knee as tendonitis of the pes

anserinus—inflammation of the expanded tendon which forms the insertion into the tuberosity of

the three muscles of the tibia[126]—by prescribing an arthritis drug, Naprosyn, and ultrasound

treatment.

Notably, none of the treatment discussed above shows that Washington is unable to

perform sedentary work.

> Sedentary work involves lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like docket files, ledgers, and small tools.
> Although a sedentary job is defined as one which involves sitting, a certain
> amount of walking and standing is often necessary in carrying out job duties.  Jobs
> are sedentary if walking and standing are required occasionally and other
> sedentary criteria are met.[127]

The evidence is consistent with these physical exertion requirements.  In particular, Dr. Cremona

---

[121]*Id.*

[122]*Id.*

[123]*Id.* at pp. 223-4.

[124]*Id.* at pp. 223.

[125]*Id.*

[126]The pes anserinus is "[t]he expanded tendon which forms the insertion into the tuberosity of the tibia of three muscles, the sartorius, gracilis, and semitendinosus."   J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. P-199 (Matthew Bender 2005).

[127]20 C.F.R § 404.1567.

opined that Washington can lift 20 pounds occasionally; lift 10 pounds frequently; stand and/or walk (with normal breaks) 6 hours in an 8-hour workday; sit for 6 hours in an 8-hour work day; and that Washington is unlimited in her ability to push/pull.[128]  Likewise, Dr. Samaratunga opined that Washington can lift 20 pounds occasionally; lift 10 pounds frequently; can stand and/or walk (with normal breaks) at least 2 hours in an 8-hour workday; can sit for 6 hours in an 8-hour work day; and that Washington is unlimited in her ability to push/pull.[129]  Dr. Gordon reported that Washington has no difficulty sitting, handling objects, hearing or speaking, but that she would have difficulty with prolonged standing or walking or lifting objects over 20 pounds.[130]  This evidence constitutes substantial evidence supporting the ALJ's determination that Washington can perform sedentary work.

The only statements in Washington's medical records that contradict these assessments are statements by Dr. Lunke on two Texas Department of Human Services forms completed on September 20, 2004 and March 21, 2005.  The instructions for completing the forms indicate that the form was required because Washington sought public assistance based on disability.  On September 20, 2004, Dr. Lunke indicated that Washington was unable to work and that her disability was permanent.[131]  In response to the question, "[w]hat can this individual do now?", Dr. Lunke responded, "no work at all."  On March 21, 2005, Dr. Lunke indicated that

---

[128]SSA record, pp. 179-86.

[129]*Id*. at pp. 197-204.

[130]*Id*. at p. 194.

[131]*Id*. at p. 208.

Washington was unable to work and that her disability was permanent.[132]  Under the remarks

section of the form, Dr. Lunke wrote, "no work permanently disabled" due to degenerative joint

disease.  Notably, the record indicates that Dr. Lunke had not examined Washington since

February 4, 2003[133]—18 months before the September 20, 2004 form and over two years before

the March 22, 2005 form.  Yet three days after he performed Washington's third arthroscopy, Dr.

Lunke did not characterize Washington as disabled or unable to work.  Instead, he reported to Dr.

Edwards that Washington showed signs of rather significant lateral compartment degenerative

changes that would have to be monitored closely.[134]  Perhaps more notably, Dr. Lunke had a

different assessment of Washington's ability to work six months after the third arthroscopy.  On

September 8, 2003, Dr. Lunke indicated on the same form that Washington's disability was not

permanent.[135]  Nothing in Dr. Lunke's treatment records suggests that Washington is permanently

disabled.[136]  The ALJ found that "the statements made by Dr. Lunke in regard to the claimant's

disability are not consistent with Dr. Lunke's own treating notes or the other evidence of the

record; therefore, Dr. Lunke's assessment is not given controlling weight."[137]  Although

Washington criticizes the ALJ for disregarding Dr. Lunke's statements about disability, the ALJ

---

[132]*Id*. at p. 207.

[133]*Id*. at p. 190.  Washington testified during the hearing that she saw Dr. Lunke in April 2005, *id*. at p. 237, but the record does not include a record of a visit after February 4, 2003.

[134]*Id*. at p. 190.

[135]*Id*. at p. 189.

[136]*See id*. at pp. 197-92.

[137]*Id*. at p. 18.

correctly observed that neither Dr. Lunke's treatment notes nor any other objective medical evidence shows that Washington has no ability to work.  The ALJ properly considered Dr. Lunke's statements.

The only other evidence indicating that Washington cannot work is her testimony on July 18, 2005.  During the hearing, the ALJ questioned Washington about why she cannot perform sedentary work.  Washington explained as follows:

> That's just like now, I'm sitting, and now my feet are swelling and it's getting the numbness sensation in it.  So, I have to always be able to either – if I prop my leg up because to make the swelling go away in my feet, it can't stay long because then my knee will start hurting.  So, I have to just – I have to take it as it goes.  I have to do what works at that particular time.  So, if that means that I have to prop my foot up for a couple of minutes because of the swelling, but then once the pain gets so bad in my knee that I have to take it down, then the foot and everything is still swollen.[138]

About the type of  movement that increases her pain, Washington testified as follows:

> All movement.  The sitting, the standing, the walking.  I'm very limited at my walking because of the pain and the swelling.
> ***
> Because my knees hurt so bad when I lay down, my feet hurt when I lay down because I get the tingling and the sharpness in my feet and toes.[139]

The ALJ found Washington's allegations of pain and limitations credible only to the extent that she is limited to sedentary activity.[140]  Washington maintains that the ALJ applied an incorrect legal standard when evaluating her complaints about pain.  Although she does not specifically identify the incorrect standard, she suggests that the ALJ erred by failing to specifically address

---

[138]*Id*. at p. 241.

[139]*Id*. at pp.242-3.

[140]*Id*. at p. 17.

the factors set out in 20 C.F.R. § 404.1529(c)(3).

In determining whether a claimant is disabled, the SSA considers all of the claimant's symptoms, including pain, and the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.[141]  Other evidence includes the claimant's own statements, statements from the claimant's treating or nontreating physician, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how the claimant's impairment(s) and any related symptoms affect her ability to work.[142]  Statements about pain alone do not establish disability—"there must be medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of . . . pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled."[143]  In considering pain, the SSA considers the factors listed in 20 C.F.R. § 404.1529(c)(3).  Those factors are shown below:

> (i) the claimant's daily activities;
> (ii) the location, duration, frequency, and intensity of the claimant's pain or other symptoms;
> (iii) precipitating and aggravating factors;
> (iv) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;
> (v) treatment, other than medication, the claimant receives or has received for

---

[141]20 C.F.R. § 404.1529.

[142]*See id.*

[143]*Id.*

relief of pain or other symptoms;
(vi) any measures the claimant uses or has used to relieve pain; and
(vii) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.[144]

Although the ALJ did not specifically address each of these factors in his opinion, specific consideration supports the ALJ's determination that Washington's allegations of pain are credible only to the extent that she is limited to sedentary activity.

Daily activities: Washington stated in a pain report that she cannot do housework, drive, shop for groceries or do anything where she has to walk, stand, sit, lay down, or climb,[145] but she testified that she is a single parent of four children, ages six through 18.  Caring for children exceeds the exertion requirements for sedentary work.

Location, duration, frequency, and intensity of pain: Washington complains about pain in both legs and both feet.  She testified that she is in pain 24 hours a day.[146]

Precipitating and aggravating factors: Washington has identified walking and standing as triggering her pain.  Although she testified that she is in pain even when sitting and laying down, she did not identify sitting as an activity that triggered pain.  Instead, she identified sitting as an activity used to alleviate pain.

Type, dosage, effectiveness, and side effects of any medication to alleviate pain: Washington testified that all movement causes her pain,[147] but she indicated that she does not take the pain

---

[144]*See id.*

[145]SSA record, p. 79.

[146]*Id*. at p. 242.

[147]*Id*. at p. 242.

medication that doctors have prescribed.[148]  It is reasonable to believe that a person in pain would take pain medication.

Treatment, other than medication, for relief of pain: Washington testified that Dr. Lunke had recommended a knee replacement for her right knee, but that the operation could not be done before the age of 50;[149] Washington was 47 at the time of the hearing.

Measures used to relieve pain: Washington testified that she must sit down when she feels pain and prop her leg up.[150]  She also testified that she lies down four times a day, but that she still feels pain when she lies down.[151]

Other factors concerning Washington's functional limitations and restrictions due to pain: Washington has indicated that she cannot do anything due to pain.

Washington has long complained about pain in her knees and feet, but her treating physicians have documented no injury and discovered no condition to account for the alleged level of pain.  The last orthopaedic surgeon who examined Washington's left knee reported that an MRI did not reveal a torn mediscus, ligaments or bone lensions to explain Washington's pain.[152]  He reported that his examination resulted in no clicking or popping or giving way of the joint, and that he found no swelling.[153]  On examination of the right knee, the doctor reported that

---

[148]*Id.* at p. 82.

[149]*Id.* at p. 239.

[150]*Id.* at p. 242.

[151]*Id.*

[152]*Id.* at p. 223.

[153]*Id.* at p. 224.

X-rays of the right knee revealed arthritic changes over the lateral compartment with a very narrow lateral compartment and spurs on the femoral condyle and medial tibial plateau, indicating that Washington had arthroscopy on the lateral mensicus, and that the medial tibial plateau looked good.[154]   At least two physicians have recommended that Washington see a pain management specialist.[155]   The record does not include an evaluation by a pain management specialist or treatment records for pain.   Instead, the record consists primarily of treatment records for Washington's knees.   Those records fail to identify a source of pain.   "Subjective complaints of pain must also be corroborated by objective medical evidence."[156]   Washington's allegations of pain are inconsistent with the objective medical evidence contained in the SSA record.   There are no medical signs or laboratory findings that show that Washington has a medical impairment which could reasonably be expected to produce the frequency and intensity of pain Washington alleges.[157]   Without some sign or finding that can explain the frequency and intensity of pain Washington alleges, there is no basis for concluding that Washington is disabled.

## VI.  Recommendation

Because substantial evidence supports the ALJ's determination that Washington can

---

[154]*Id.* at p. 222.

[155]*See id.* at pp. 176 & 211.

[156]*Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).  *See Davis v. Heckler*, 759 F.2d 432, 434 (5th Cir. 1985) ("[A]llegations of pain must be supported by clinical and laboratory evidence of a condition which would cause such pain.").

[157]*See Anthony v. Sullivan*, 954 F.2d 289, 296 (5th Cir. 1992) ("At a minimum, objective medical evidence must demonstrate the existence of a condition that could reasonably be expected to produce the level of pain or other symptoms alleged.").

perform the full range of sedentary work, I recommend that Washington's request for relief (docket entry # 1) be DENIED and that the Commissioner's decision denying Washington benefits be AFFIRMED.

### VII. Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this Memorandum and Recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "Filing User" with the Clerk of Court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this Memorandum and Recommendation must be filed within 10 days after being served with a copy of same, unless this time period is modified by the District Court.[158]  **Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the Magistrate Judge.**  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the District Court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the District Court.[159]  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Memorandum and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed

---

[158]28 U.S.C. §636(b)(1); FED. R. CIV. P. 72(b).

[159]*Thomas v. Arn*, 474 U.S. 140, 149-152 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).

factual findings and legal conclusions accepted by the District Court.[160]

      **SIGNED** on April 17, 2007.


NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[160]*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).